## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**

**GAYK KAZAROSOVICH ESKICHYAN**          **No. 09-CR-152-RET-SCR**
**a/k/a/ Haik Mike Eskichyan and**
**HAROUT ANSOURIAN**

## <u>RULING ON MOTION TO SUPPRESS</u>

This matter is presently before the Court on a Motion to Suppress (Doc. No. 28) filed by defendant, Harout Ansourian ("Ansourian"). The United States has filed a Response to the Motion (Doc. No. 33). Ansourian has filed a Supplemental Memorandum in Support of the Motion to Suppress (Doc. No. 42). An evidentiary hearing was held on February 10, 2010, and was concluded on March 30, 2010. Subsequently, Ansourian filed Second and Third Supplemental Memoranda in Support of the Motion to Suppress (Doc. Nos. 51 & 63) and the United States of America filed a Response to Defendant's Second Supplemental Memoranda in Support of the Motion to Suppress (Doc. No. 55). The Court, having reviewed the record, the law, and the arguments of the parties, now concludes that the defendant's motion should be **DENIED** for the following reasons.

Doc#1843

## FACTUAL BACKGROUND

On December 9, 2009, shortly after midnight, Baton Rouge Police Officer Jarod Averette was patrolling Interstate I-10 in Baton Rouge. While on patrol, he noticed a pickup truck towing a car on a trailer that was drifting into an adjacent lane as it approached the I-10, I-12 split. A few seconds later, the truck drifted out of its lane again, straddled the lane divider between I-10 and I-12, and continued along I-12 while occupying two lanes of traffic. Officer Averette initiated a traffic stop of the truck. A video camera mounted inside the patrol car and a microphone attached to Officer Averette's clothing recorded the encounter.[1]

When the truck came to a complete stop alongside the interstate, Officer Averette approached from the passenger side of the vehicle and immediately asked the driver of the truck, Ansourian, to step out and accompany him to the front of his patrol car. Ansourian complied and brought his driver's license and several other documents with him. Officer Averette proceeded to question Ansourian about his travels, his passenger, Gayk Kazarosovich Eskichyan ("Eskichyan"), and ownership of the truck, car, and trailer. Ansourian responded that he was driving from California to Florida, that he was from Florida and Eskichyan was from California, that he planned to return to Florida and Eskichyan was visiting Florida, and that he borrowed the trailer from a friend in Florida and Eskichyan owned the car. During their conversation, Officer Averette pointed to

---

[1] See United States Exhibit 2.

the documents that Ansourian held and asked "is that your insurance."  Ansourian responded in the affirmative, handed Officer Averette documentation pertaining to the truck, and maintained possession of several other documents. Officer Averette next approached Eskichyan and asked similar questions. Eskichyan's answers corroborated those of Ansourian and, pursuant to Officer Averette's request, Eskichyan provided his driver's license. Officer Averette then asked both men to "hang tight" for a few minutes while he went to his patrol car to check their drivers' licences.

After entering his patrol car, Officer Averette turned the camera's audio off, called for backup, and ran a computer check. During the suppression hearing, when asked what was said during his call for backup, Officer Averette testified that he told other officers to come to his location and that he "had a vehicle [he] wanted to search."[2] Officer Averette also testified that he called for backup prior to running the computer check.[3]

Approximately thirteen minutes after Officer Averette entered his patrol car, he turned the audio back on, exited the vehicle, asked Ansourian for proof of insurance on the car, and stated that the insurance paperwork on the truck did not sufficiently identify the truck. Ansourian provided a registration certificate for

---

[2] Record Document No. 41, Transcript of February 10, 2010, Suppression Hearing, p. 66, ln. 20-21.

[3] Record Document No. 41, Transcript of February 10, 2010, Suppression Hearing, p. 12, ln. 8-10.

the truck and stated that he could retrieve the car's documentation. Officer

Averette responded that he would get the car documentation himself and began

reviewing the truck's registration certificate. At the suppression hearing, Officer

Averette testified that at the time of exiting his vehicle, he had no intent to charge

defendants with failure to provide insurance documentation nor did he intend to

run a computer check to determine whether the vehicles had been stolen.[4]

After reviewing the truck's registration certificate, Officer Averette resumed

his questioning of Ansourian. During this time, Officer Gerardo Almendares, an

Immigration and Naturalization Service officer arrived and began questioning

Ansourian. As Officer Almendares questioned Ansourian, Officer Averette

approached Eskichyan again to ask him for the car's paperwork. Eskichyan

explained that it would be difficult to open the car doors to retrieve the paperwork

because the doors were blocked by the trailer's fenders.

Approximately twenty eight minutes into the stop, Officer Averette walked

back to Ansourian, returned his license and paperwork, advised him that he was

not going to be ticketed for the traffic violation, and said, "You're free to go." Ten

seconds later, Officer Averette asked Ansourian for consent to search

Ansourian's "stuff."  Ansourian immediately responded, "You're more than

welcome to. . . ," but told Officer Averette that he and Eskichyan were "really in a

---

[4] Record Document No. 41, Transcript of February 10, 2010, Suppression Hearing, p. 41, ln. 20-23.

hurry." Officer Averette assured Ansourian that the search "wouldn't take very long." Ansourian asked the officer what he was looking for. Officer Averette responded that he was looking for "anything illegal" and stated "do you mind if I search your vehicle." Ansourian responded, "I don't mind."

Officers began to search the vehicles and recovered $1,300 in cash, several gift cards, and plastic cards which appeared to be counterfeit hidden in the truck's headliner. A search of the car's trunk revealed several more plastic cards which appeared to be counterfeit credit cards, a laptop computer, handwritten lists of four-digit personal identification numbers (PINs), small pinhole cameras, credit card readers, and numerous electronic data storage devices. The defendants were immediately arrested.

## DISCUSSION

Defendant, Ansourian, moves to suppress any and all physical evidence seized pursuant to the search of the vehicles. For purposes of this Motion, Defendant concedes that the initial stop of the vehicle was justified but instead argues that his continued detention after the computer check was complete violated the Fourth Amendment. Moreover, defendant argues that the consent to search the vehicles given by Ansourian was invalid, claiming that it was neither voluntarily given nor an independent act of free will. Defendants also challenge Ansourian's consent on the basis that Officer Averette only had consent to search the truck, not the vehicle that was being towed.

## I. Fourth Amendment Analysis

### 1. Reasonable Suspicion

Pursuant to the Supreme Court's seminal decision in **Terry v. Ohio**, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Fifth Circuit has concluded that "[t]he stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment."[5] Under **Terry**, a two-part test is employed to determine the legality of police investigatory stops. A court must "first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop."[6]

Whether an officer's actions are "reasonably related in scope to the circumstances that justified the stop" is a fact-specific question often informed by "timing and sequence."[7] Although the Fifth Circuit has rejected a bright-line approach to reviewing the reasonableness of traffic-related detentions,[8] the Court frequently concludes that a search is not reasonably related to the circumstances justifying a traffic violation stop when the search in question occurs after the time

---

[5] **United States v. Brigham**, 382 F.3d 500, 506 (5th Cir.2004) (en banc).

[6] **Id.** at 506.

[7] **Id.** at 510.

[8] See **id.**

required for an officer to issue a citation (or to decide against doing so) and to

complete a "computer check" for outstanding warrants and vehicle theft.[9] In

**United States v. Santiago**, the Fifth Circuit articulated an oft-cited rule:

> During a traffic stop, an officer can request a driver's license, insurance papers, and vehicle registration; he or she may also run a computer check and issue a citation. The officer may detain and question the subjects of a traffic stop during the time a computer check is being conducted. Furthermore, [the Fifth Circuit] usually does not scrutinize the particular questions asked during a stop so long as they tend to relate to the purpose of the stop.
>
> * * *
>
> However, a Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop. Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed.[10]

Likewise, in **United States v. Dortch**, 199 F.3d 193, 200 (5th Cir.1999), a

case that predated **Santiago**, the Fifth Circuit held that where the evidence

plainly reflected that officers completed a computer check before initiating a

canine search, it was unreasonable to detain the defendant pending the dog

search.

As noted in **Santiago**, in order to prolong a detention after issuing a citation

---

[9] **United States v. Cavitt**, 550 F.3d 430, 435 (5th Cir.2008).

[10] **Santiago**, 310 F.3d 336, 341-42 (5th Cir.2004) (citations omitted); <u>see also</u> **United States v. Jenson**, 462 F.3d 399, 404 (5th Cir.2006) ("Detention ... may last no longer than required to effect the purpose of the stop. If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." (citations omitted)).

or determining that no citation should be issued, an officer must have a "reasonable suspicion" that a crime "has been or is being committed."[11] Reasonable suspicion "exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure."[12] Accordingly, "[o]nce the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts," – suspicion, that is, of criminal activity "additional" to the suspicion that justified the initial stop.[13] Therefore, Officer Averette's continuing detention of Ansourian after the negative computer check came was unconstitutionally prolonged unless "additional reasonable suspicion [arose] in the course of the stop and before the initial purpose of the stop ha [d] been fulfilled."[14]

"Reasonable suspicion must be based on more than the officer's sense that a detainee appears to have something to hide."[15] In **Santiago**, the Fifth

---

[11] **Santiago**, 310 F.3d at 342.

[12] **United States v. Estrada**, 459 F.3d 627, 631 (5th Cir.2006) ("Under **Brigham**, the purpose of the initial stop ended at 12:18, when the results of the criminal background check came back negative, unless the officers formed additional reasonable suspicion before that time." ).

[13] **Id.** at 631.

[14] **United States v. Lopez-Moreno**, 420 F.3d 420, 431 (5th Cir.2005).

[15] **Cavitt**, 550 F.3d at 437.

Circuit rejected the government's contention that an officer had reasonable suspicion to continue a detention because the defendant took an unusually long time to pull over, acted nervous, gave seemingly unbelievable answers to various questions, and provided statements regarding the details of his trip that conflicted with the answers provided by the other occupant of the vehicle, who was questioned separately.[16] In that case, the Fifth Circuit held that "mere 'uneasy feelings' and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking."[17]

However, reasonable suspicion may arise when the sort of observations and behavior described above are coupled with more concrete evidence that suggests the commission of a specific offense. For example, in **Estrada**, the Fifth Circuit concluded that reasonable suspicion was established when an officer noticed " 'fresh marks' and 'scratches' around the fuel tank eye piece latches and vehicle frame," which indicated the presence of an "adhesive material" near the gas tank.[18] In that case, the Court made much of the fact that the officer's "extensive classroom training and on-the-job experience, including an occasion at which he found illegal narcotics concealed in a gas tank in a similar fashion," led

---

[16] **Santiago**, 310 F.3d at 342.

[17] **Estrada**, 459 F.3d at 631 (citing **Santiago**, 310 F.3d at 338-39).

[18] **Id.** at 632.

him to reasonably suspect that "a false compartment or container had been built into the fuel tank to conceal contraband[-a]dhesive material is typically used to cover newly created compartments to prevent seepage of fuel and contraband."[19] Similarly, in **United States v. Sanchez**, 507 F.3d 877, 882 (5th Cir.2007), vacated on other grounds, 128 S.Ct. 2428, 171 L.Ed.2d 227 (2008), the Fifth Circuit held that reasonable suspicion arose when an officer noticed prior to a search that the wheel rims on the detainee's truck had been painted.[20] The officer later testified that "he knew that drug traffickers often paint their wheel rims to hide marks stemming from alterations they make to tires and rims to conceal contraband."[21]

Here, Officer Averette's initial stop was justified on the basis that Ansourian committed a traffic violation,[22] a point that defendant does not dispute.[23] In addition, during the course of the stop, Officer Averette was permitted to "ask about the purpose and itinerary of a driver's trip during the traffic stop,"[24] "undertake similar questioning of the vehicle's occupants to verify the information

_____

[19] **Estrada**, 459 F.3d at 632.

[20] **Id.**

[21] **Id.**

[22] See **Lopez-Moreno**, 420 F.3d at 430.

[23] See Record Document No. 28-1, p. 6, n. 1.

[24] **Brigham**, 382 F.3d at 508.

provided by the driver,"[25] examine defendants' driver's licenses and registration, and to run a computer check to investigate whether defendants had any outstanding warrants and whether the vehicles were stolen.[26] Once the computer check had been completed and Averette had decided not to issue a citation, however, the detention could not be prolonged unless additional reasonable suspicion, supported by articulable facts, developed during the stop.[27] Defendant claims that, after the computer check was complete, no additional reasonable suspicion arose and that the officers continued to detain them because they were determined to search them without a valid reason.

The government argues that a number of circumstances existed or occurred before the officer exited his vehicle subsequent to the computer check that could have led the officers to suspect that defendants might be involved in criminal activity. Specifically, the government claims that Officer Averette's suspicion was fueled by the following facts: (1) Defendants' nervousness; (2) Defendants' inability to provide any paperwork regarding the car; (3) "Eskichyan's attempt to disassemble or destroy his cell phone;" and (4) Defendants' recent criminal histories.

------

[25] **Id.**

[26] **Brigham**, 382 F.3d at 507-08.

[27] See **Id.** at 507.

## A. Nervousness

Officer Averette stated that defendants' lack of eye contact, shaking, pacing, extreme talkativeness, and "Eskichyan's difficulty in pulling his license out of his wallet" led him to reasonably suspect that defendants may have been violating more than just a traffic law.

"Nervousness is a sufficiently common – indeed natural – reaction to confrontation with the police" and, unless the nervousness exhibited is extraordinary and prolonged, should be given "limited significance" in a reasonable suspicion analysis.[28] The Fifth Circuit has given credence to this principal in cases such as **Santiago**, **Dortch**, and **Portillo-Aguirre** where the Court found that mere "uneasy feelings," inconsistent stories, and other generic claims of nervousness are insufficient – by themselves – to support reasonable suspicion.[29]

After a review of the videotape depicting the stop, the Court finds that neither defendant exhibited an abnormal amount of nervousness which might cause a reasonable officer to suspect that additional criminal activity is afoot. During the stop, Ansourian stated that he had been driving for several hours. As

---

[28] **United States v. Santos**, 403 F.3d 1120, 1227 (10th Cir.2005).

[29] See **Santiago**, 310 F.3d at 338-39; **Dortch**, 199 F.3d at 200.; **United States v. Portillo-Aguirre**, 311 F.3d 647, 656 (5th Cir.2002) (citing **United States v. Salzano**, 158 F.3d 1107, 1113 (10th Cir.1998) ("Nervousness alone cannot support reasonable suspicion of criminal activity. This is because it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.")).

Officer Averette began to run a computer check, Ansourian began stretching and slowly pacing. Both of these actions are not abnormal considering Ansourian's statement to Averette that he had been driving for several hours and the amount of time taken to conduct the computer check and call for backup.

Moreover, any lack of eye contact, excessive talkativeness, shaking, and difficulty in providing documentation to Officer Averette exhibited by defendants in this case is exactly the sort of generic nervousness that should be given "limited significance" in a reasonable suspicion analysis. Indeed, defendants' lack of eye contact or excessive talkativeness was minimal at best and Officer Averette testified that the shaking could not even be seen on the video.[30] Furthermore, defendants provided consistent answers when asked about their travel plans and were extremely cooperative during Officer Averette's questioning.

### B. Inability to Provide Paperwork Regarding the Car

At the suppression hearing, Officer Averette candidly admitted that after the computer checks were complete, he had no intent to charge defendants with failure to provide insurance documentation nor did he intend to run a computer check to determine whether the vehicles had been stolen.[31] Therefore, the only reasonable inference that can be drawn from this testimony is that any suspicion

---

[30] Record Document No. 41, Transcript of February 10, 2010, Suppression Hearing, p. 56, ln. 12-19.

[31] Record Document No. 41, Transcript of February 10, 2010, Suppression Hearing, p. 41, ln. 20-23.

concerning ownership and insurance coverage of the vehicles either never arose, or was sufficiently dispelled, by the time Officer Averette exited his vehicle after completion of the computer checks. If Averette was not concerned with these facts, they simply cannot be used to form the basis of reasonable suspicion needed to prolong the detention. Accordingly, the defendants' inability to provide any paperwork regarding the vehicles is irrelevant to the reasonable suspicion calculus.[32]

### C. Eskichyan's Attempt to Disassemble or Destroy His Cell Phone

After running a computer check and briefly questioning Ansourian, Officer Averette decided to approach Eskichyan again and ask him for the car's paperwork. As Officer Averette approached the truck, the government contends that Averette saw Eskichyan "fumbling with something" and that as Averette got closer, he saw Eskichyan quickly throw something onto the dashboard and noticed that Eskichyan had partially disassembled his cell phone. The government contends that these facts support a finding of reasonable suspicion. The government's reliance on these facts is misplaced, however.

The Fifth Circuit has repeatedly stressed that detention "cases are about timing and sequence: after the computer checks [come] up 'clean,' [and] there remain[s] no reasonable suspicion of wrongdoing by the vehicle occupants[,]

---

[32] See, e.g., **Estrada**, 459 F.3d at 631.

[c]ontinued questioning thereafter unconstitutionally prolong[s] the detentions."[33] For this reason, in **Jenson**, the Fifth Circuit refused to consider facts that did not arise "before the initial purpose of the stop [had] been fulfilled" – i.e., facts which arose after the computer checks confirmed that defendants' drivers licenses were valid and that there were no outstanding warrants.[34]

In the instant case, the stop was effected pursuant to a traffic violation. It is undisputed that the computer checks revealed no invalid drivers' licenses or outstanding warrants. Furthermore, the government admits that Eskichyan did not attempt to disassemble or destroy his cell phone until after the computer check was complete. Because Eskichyan's alleged attempt to disassemble or destroy his cell phone occurred after the initial purpose of the stop had been fulfilled, this fact cannot be used to support a finding of reasonable suspicion.

### D. Criminal History

The government contends that Officer Averette learned the following with respect to defendants' criminal histories when running the computer checks:

---

[33] **Brigham**, 382 F.3d at 510.

[34] See **Jenson**, 462 F.3d at 404 ("The government offers three reasons why there was reasonable suspicion to extend Jenson's traffic stop beyond 11:02 (the time the licenses cleared): (1) It took an unusually long time for Jenson's van to pull over, (2) Jenson's excessive talkativeness indicated nervousness, and (3) Jenson and Cotton appeared to give inconsistent answers. We decline to consider Jenson's and Cotton's contradictory answers, because the alleged inconsistency did not arise until 11:04 and therefore not 'before the initial purpose of the stop [had] been fulfilled.' "); see also **U.S. v. Sierra**, 294 Fed. Appx. 884, 888-889 (5th Cir. 2008) (unpublished) ("Because the remaining two facts arose [after the initial purpose of the stop had been fulfilled], we do not consider them when determining whether Deputy Womack had reasonable suspicion to continue the detention.").

Ansourian had a prior arrest for first degree murder, Eskichyan had a prior arrest for carrying a loaded firearm, and both men had been arrested less than a month earlier for fraud.

Although this information is relevant to a finding of reasonable suspicion, past criminal history, "by itself, does not create a reasonable suspicion that criminal activity is currently afoot, which is what the Supreme Court requires."[35] The Court has concluded that defendants' nervousness should be given limited, if any, significance in the reasonable suspicion analysis; that defendants' inability to provide any paperwork regarding the vehicles is irrelevant to the reasonable suspicion calculus; and that evidence indicating that Eskichyan attempted to disassemble or destroy his cell phone cannot be used to support a finding of reasonable suspicion. Therefore, the Court must determine whether defendants' criminal histories, combined with their ordinary nervousness, can form the basis of reasonable suspicion needed to prolong the detention. The Court holds that it cannot.[36]

---

[35] **Joshua v. DeWitt**, 341 F.3d 430, 446 (6th Cir.2003) (citing **Terry v. Ohio**, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); see also **United States v. Mathurin**, 561 F.3d 170, 177 (3d Cir.2009); **United States v. Sprinkle**, 106 F.3d 613, 618 (4th Cir.1997); **United States v. Johnson**, 427 F.3d 1053, 1057 (7th Cir.2005); **Burrell v. McIlroy**, 464 F.3d 853, 858 n. 3 (9th Cir.2006); **United States v. Rice**, 483 F.3d 1079, 1085 (10th Cir.2007) (citing **United States v. Davis**, 94 F.3d 1465, 1468 (10th Cir.1996)).

[36] See, e.g. **United States v. Jackson**, 517 F. Supp.2d 859, 878 (W.D. La. 2007) (nervousness, criminal history, and unusual travel story did not provide reasonable suspicion); Cf. **Dortch**, supra (conflicting stories from the driver and passenger concerning their point of origin, neither driver nor passenger were listed as authorized drivers on the rental agreement, and the driver's nervousness, did not give rise to a reasonable suspicion of drug trafficking);

The Court does not doubt Officer Averette's credibility, nor his training and experience. The Court also does not doubt that defendants' criminal histories may have been in Officer Averette's mind and that he was frightened when he called for backup. But no amount of training or experience can turn the simple, objective facts that defendants had criminal histories and exhibited ordinary nervousness into articulable suspicion that defendants were about to commit a crime. If such common circumstances qualified as reasonable suspicion, then many – if not most – interstate travelers would be subject to prolonged detention. Weighing the totality of the circumstances, the Court finds that the officer lacked the requisite reasonable suspicion to detain defendants after the computer check was complete, and therefore, the detention was unconstitutional.

## 2. Consent

The government contends that even if the officer unreasonably extended the traffic stop beyond the point at which the truck's occupants' licenses were cleared, Ansourian's consent to search cured any Fourth Amendment problem. Defendant argues that the consent to search the vehicles given by Ansourian was

---

**United States v. Jones**, 234 F.3d 234 (5th Cir.2000) (discrepancies between the driver and passenger's explanations about their destination and the nature of their business, the fact that the car had been rented by the driver's mother but neither he nor the passenger were listed as authorized drivers, and the driver's admission that he previously had been arrested for crack cocaine possession, did not establish reasonable suspicion of criminal activity); **Santiago**, supra, (nervousness and conflicting statements by vehicle occupants did not provide reasonable suspicion); **United States v. Thibodeaux**, 276 Fed.Appx. 372, 379-80 (5th Cir.2008) (unpublished) (no reasonable suspicion where defendant: left his car door open; was hesitant to approach officer; tried to return to car; appeared jittery; initially refused to comply with request to sit in back of car; and collapsed emotionally on the ground).

neither voluntarily given or an independent act of free will and that Officer Averette did not have consent to search the vehicle that was being towed.

### A. Scope of Consent

The Fourth Amendment proscribes unreasonable searches and seizures. A search not based on a warrant may still be reasonable if based on probable cause or, as here, consent.[37] When conducting a warrantless search of a vehicle based on consent, officers have no more authority to search than it appears was given by the consent.[38] The scope of consent is determined by objective reasonableness - what a reasonable person would have understood from the exchange between the officer and searched party-and not the subjective intent of the parties.[39]

Defendant argues that the Officer Averette asked for permission to search only the defendant's car – "He did not ask to search the defendant's car _and_ the vehicle that was being towed."[40]  In support of this proposition, defendant points to two questions that Averette allegedly asked Ansourian during the stop: "can we

---

[37] **United States v. Mendoza-Gonzalez**, 318 F.3d 663, 666 (5th Cir.2003) (citing **United States v. Ross**, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); **Schneckloth v. Bustamonte**, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

[38] **Mendoza-Gonzalez**, 318 F.3d at 666-67.

[39] **Florida v. Jimeno**, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); **Mendoza-Gonzalez**, 318 F.3d at 667.

[40] Record Document No. 51, Defendant's Second Supplemental Memorandum in Support of the Motion to Suppress, p. 2.

search your stuff..." and "then you don't mind if we search your car."

First, the Court notes that the video of the stop shows that a truck was towing a car. Second, the exchange between Averette and Ansourian occurred, in relevant part, as follows:

Averette: "You don't mind if we search your stuff before you leave?"

Ansourian: "You're more than welcome to... we're really in a hurry..."

Averette: "We won't take very long."

Ansourian: "If you checked everything you could, what are you looking for?"

Averette: "Just anything illegal... Do you mind if I search your vehicle"

Ansourian: "I don't mind"[41]

Before Officer Averette obtained Ansourian's consent to search, he was well aware that Eskichyan owned the car that was being towed and that Ansourian claimed ownership of the truck.[42] Therefore, when Averette asked Ansourian whether he minded if Averette searched *his* stuff and *his* vehicle, a reasonable person would have understood that Averette was referring to the truck rather than Eskichyan's car. Furthermore, Ansourian approached the officers while they were searching the truck and offered to remove the trailer fenders in

---

[41] See United States Exhibit 2, 28:10.

[42] See United States Exhibit 2, 2:40, 3:08, 6:17.

order to allow the Officers to gain access to the car that was being towed.[43] Therefore a reasonable person would have understood that consent was being given to search the car as well.[44] Accordingly, this Court finds that it was objectively reasonable for the officers to believe that the scope of consent extended to both vehicles.

### B. Validity of Consent

"Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation."[45] To determine whether consent was validly given, this Court must ask (1) whether consent was voluntary and (2) whether it was an independent act of free will.[46] "The first prong focuses on coercion, the second on causal connection with the constitutional violation."[47] A multi-factor test is employed to determine whether consent was voluntary, in which the Court must consider:

> (1) the voluntariness of the defendant's custodial status; (2) the presence

---

[43] Record Document No. 47, Transcript of March 30, 2010, Suppression Hearing, p. 24, ln. 2-6.

[44] Even assuming that Ansourian's offer to remove the fenders did not provide the requisite consent to search the car, the video of the stop clearly shows that the car was not searched until the officers found large amounts of cash and blank credit cards in the truck. Therefore, this Court also finds that the officers had probable cause to search the car.  See United States Exhibit 2 (cash and cards were placed on Officer Averette's cruiser on 1:06:06 and the car was not searched until 1:16:10).

[45] **United States v. Chavez-Villarreal**, 3 F.3d 124, 127 (5th Cir.1993).

[46] See Santiago, 310 F.3d at 342 (citing **Chavez-Villarreal**, 3 F.3d at 127).

[47] **Chavez-Villarreal**, 3 F.3d at 127.

of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[48]

The government bears the burden of proving that consent was voluntary.[49]

"Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will."[50] "To determine whether the causal chain was broken, [this Court considers]: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct."[51] The government has the burden of showing admissibility.[52]

The videotape reflects that after the computer check was complete, Officer Averette walked back to Ansourian, returned his license and paperwork, advised him that he was not going to be ticketed for the traffic violation, and said, "You're free to go." Approximately ten seconds later, Officer Averette asked Ansourian for consent to search the vehicles. Ansourian immediately responded, "You're more than welcome to. . . ," but told Officer Averette that he and Eskichyan were "really

---

[48] **Jones**, 234 F.3d at 242 (citing **Shabazz**, 993 F.2d at 438).

[49] See **id.**

[50] **Chavez-Villarreal**, 3 F.3d at 127-28.

[51] **Id.** at 128.

[52] **Id.**

in a hurry."  Officer Averette told Ansourian that the search "wouldn't take very long."  Ansourian asked the officer what he was looking for. Officer Averette responded that he was looking for "anything illegal" and again asked for consent to search the vehicles. Ansourian responded, "I don't mind."  At the time consent to search was given, Ansourian had not been physically restrained, placed in handcuffs, or put in the police car, and none of the officers present had their weapons drawn.

### a. Consent Was Voluntarily Given

As previously mentioned, under the voluntariness prong, the Court must consider:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

The Court, after carefully reviewing the videotape and considering the oral testimony at a suppression hearing finds as follows.

Pursuant to the first factor, Ansourian was not in any type of custody when he gave his consent to search the vehicles. The record clearly reflects that Officer Averette expressly told Ansourian that he was free to leave, and he had returned Ansourian's license and paper work. At the time Ansourian gave his consent, he had all of the materials he would need to be "on his way,"[53] and had no "objective

---

[53] **United States v. Sanchez-Pena**, 336  F.3d 431, 433 (5th Cir.2003).

reason" to believe that he was not free to leave.[54]

Considering the second factor, it cannot be said that any coercive police procedures were used to secure Ansourian's consent in the instant case. As previously mentioned, Ansourian's assent to the search came in a consensual encounter, defendants were not handcuffed until the search revealed the presence of contraband, no threats or violence were used, and there was no overt display of authority.[55] Only after Ansourian and Eskichyan received all of their documentation back so that they could be on their way did Officer Averette ask if Ansourian would mind if he searched the vehicles.

The third factor, the extent and level of the defendants' cooperation with Officer Averette also weighs in favor of finding that Ansourian's consent was voluntarily given. The video reflects that Ansourian was extremely cooperative with Officer Averette.

The fourth factor weighs against a finding of voluntariness. The government presented no evidence, nor does the video reflect that defendants were explicitly made aware of their right to refuse consent. Further, no Consent to Search Form was provided to defendants during the encounter.

---

[54] See, e.g., Id.

[55] See, e.g., Sanchez-Pena, 336 F.3d 431, 433; See also United States v. Tompkins, 130 F.3d 117, 122 (5th Cir.1997)("[C]oercive police procedures were absent, i.e., [Defendant] was not handcuffed until the search revealed the presence of [drugs], no threats or violence were used, and there was no overt display of authority....").

The fifth factor weighs in favor of a finding of voluntariness. In the video, Ansourian was extremely articulate and told Officer Averette that he owned a business and had been a U.S. citizen for years. Ansourian spoke and understood English extremely well and responded affirmatively each time he was asked for consent.[56]

Finally, the last factor weighs against a finding of voluntariness.[57]  Because the contraband was well hidden in the headliner of the truck and the car was difficult to access, the record could support a finding that Defendant believed that no incriminating evidence would be found.[58]

Considering the totality of the circumstances while keeping in mind that no single factor is dispositive,[59] the Court finds that Ansourian's consent was voluntarily given. The Court must now determine whether Ansourian's consent was an independent act of free will.

### b. Consent Was an Independent Act of Free Will

"Even though voluntarily given, consent does not remove the taint of an

---

[56] See **United States v. Khanalizadeh**, 493 F.3d 479, 484 (5th Cir. 2007) (holding that the defendant's consent was voluntary, where the defendant, an Iranian national, spoke and understood English fairly well, responded in the affirmative each time he was asked for consent, he was not physically restrained, and the officer did not brandish a weapon).

[57] See **United States v. Slanina**, 283 F.3d 670, 681 (5th Cir. 2002) (Defendant's belief that incriminating evidence would be found militates against a finding of voluntariness).

[58] See, e.g., **United States v. Gurrola**, 301 Fed. Appx. 337, 342 (5th Cir. 2008).

[59] **United States v. Ruigomez**, 702 F.2d 61, 65 (5th Cir. 1983).

illegal detention if it is the product of that detention and not an independent act of free will."[60]  The purpose of this inquiry is to determine whether there was a "break in the causal chain" between the constitutional violation and the consent.[61] "To determine whether the causal chain was broken, [this Court considers]: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct."[62]

The first factor supports a finding that defendant's consent was not an independent act of free will. The Fifth Circuit has generally held that the shorter the temporal proximity between the illegal detention and consent, the more likely consent was not an independent act of free will.[63] In the instant case, Ansourian's consent to search was obtained contemporaneously with the constitutional violation. Nevertheless, it should be noted that Ansourian was asked for consent only twenty eight minutes into the stop and therefore, this is not a case in which the defendant's will was overborne by a lengthy detention.

The second factor supports a finding that defendant's consent was an

---

[60] **Chavez-Villarreal**, 3 F.3d at 127-28.

[61] See **Santiago**, 310 F. 3d at 343.

[62] **Chavez-Villarreal**, 3 F.3d at 128.

[63] See **Jenson**, 462 F.3d 399, 407 (finding that consent was not an act of free will where defendant's consent followed closely on heels of illegal detention, and there was no evidence that motorist knew he was free to leave or that his license had been returned to him); See also **Jones**, 234 F.3d at 243; **Dortch**, 199 F.3d at 202.

independent act of free will. Several minutes after the computer checks were complete, Ansourian was told that he was free to leave, and his license had been returned to him. In **Jenson**, the Fifth Circuit recognized that both of these facts could be viewed as intervening circumstances which could support a finding that Ansourian's consent was given as an independent act of free will.[64] Additionally, the extremely close temporal proximity between the point at which Ansourian was told that he was free to leave, the return of Ansourian's driver's license and paperwork, and Officer Averette's request for consent suggests that Ansourian was well aware that he was free to leave and instead, by an "independent act of free will," chose to consent to the search. Further bolstering this position, Baton Rouge Police Officer Kevin Istre testified at the suppression hearing that he arrived at the site of the stop, participated in the search of the vehicles, and that during the search, neither defendant told him that they wanted to leave, asked how much longer the search would take, protested that the search was taking too long, or told him to stop searching the vehicles.[65] In fact, Officer Istre testified that while a search of the truck was underway, Ansourian offered to remove the trailer fenders in order to allow the Officers to gain access to the car, which was on top

---

[64] **Jenson**, 462 F.3d at 407.

[65] Record Document No. 47, Transcript of March 30, 2010, Suppression Hearing, p. 41.

of the trailer.[66] Immigration and Naturalization Service Officer Almendares, who arrived at the site prior to the search and remained until defendants' arrest, corroborated the testimony of Officer Istre.[67]

Finally, the third factor supports a finding that defendant's consent was an independent act of free will. The police misconduct in this case was not flagrant or purposeful in the sense that the officers used the period of the illegal detention to procure defendant's consent to search the vehicles; nor was the consent procured through misrepresentations made to defendants. Instead, the unlawful detention spanned only seven minutes, the video clearly shows that no misrepresentations were made to secure Ansourian's consent as Officer Averette told Ansourian that he was looking for "anything illegal" prior to securing Ansourian's consent, and once the search began, neither defendant attempted to stop the search, revoke consent, or complain about the length of the search.

Therefore, considering the totality of the circumstances, the Court concludes that Ansourian's consent was voluntary and an independent act of free will sufficient to dissipate any taint of the unlawful detention.

---

[66] Record Document No. 47, Transcript of March 30, 2010, Suppression Hearing, p. 24, ln. 2-6.

[67] Record Document No. 47, Transcript of March 30, 2010, Suppression Hearing, p. 24, ln. 2-6.

## CONCLUSION

Having carefully reviewed the briefs of the parties, the videotape of the stop, and the testimony given at the suppression hearing, the Court finds that the initial stop of the vehicle was justified but Ansourian's detention was unconstitutionally prolonged. The Court further finds that the consent to search the vehicles given by Ansourian was sufficient to dissipate the taint of the unlawful detention as Ansourian's consent was voluntarily given and an independent act of free will.

Accordingly, for the foregoing reasons assigned,

IT IS ORDERED that the Motion to Suppress (Doc. No. 28) filed by defendant, Harout Ansourian, is **DENIED**.

Baton Rouge, Louisiana, this 12th day of October, 2010.

**RALPH E. TYSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**